**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

HAILU ABATENA,

               **Plaintiff,**

v.

                **Civil Action No. 2:13cv699**

NORFOLK STATE UNIVERSITY ET AL.,

               **Defendants.**

FILED

MAY - 7 2014

CLERK, US DISTRICT COURT
N... ... ... ...

## OPINION AND ORDER

This matter is before the Court on Defendants Norfolk State University and the Visitors of Norfolk State University (collectively, referred to herein as "NSU" or the "University"); the Comptroller of the Commonwealth of Virginia; Tony Atwater (in his official and individual capacity); Sandra DeLoatch (in her official and individual capacity); and Clarence Coleman's (in his official and individual capacity) Motion to Dismiss ("Motion") for failure to state a claim upon which relief can be granted, Doc. 3. See Fed. R. of Civ. P. 12(b)(6).

On March 19, 2014, the Court held a hearing on the Motion, heard argument from counsel, but withheld making findings of fact or issuing a ruling except to state for the record that Plaintiff had alleged sufficient facts in his Complaint to support a breach of contract claim. The Court could not determine the plausibility of Plaintiff's Section 1983 claim; accordingly, it ordered the Plaintiff to file a more definite statement within ten days of the hearing detailing how

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
NORFOLK DIVISION

**HAILU ABATENA,**

     **Plaintiff,**

v.                                       **Civil Action No. 2:13cv699**

**NORFOLK STATE UNIVERSITY ET AL.,**

     **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Norfolk State University and the Visitors of Norfolk State University (collectively, referred to herein as "NSU" or the "University"); the Comptroller of the Commonwealth of Virginia; Tony Atwater (in his official and individual capacity); Sandra DeLoatch (in her official and individual capacity); and Clarence Coleman's (in his official and individual capacity) Motion to Dismiss ("Motion") for failure to state a claim upon which relief can be granted, Doc. 3. See Fed. R. of Civ. P. 12(b)(6).

On March 19, 2014, the Court held a hearing on the Motion, heard argument from counsel, but withheld making findings of fact or issuing a ruling except to state for the record that Plaintiff had alleged sufficient facts in his Complaint to support a breach of contract claim. The Court could not determine the plausibility of Plaintiff's Section 1983 claim; accordingly, it ordered the Plaintiff to file a more definite statement within ten days of the hearing detailing how

1

NSU employees failed to follow the University's procedures in terminating his employment. As the filings are now complete, the Court is ready to rule on Defendants' Motion.

For the reasons contained herein, Defendants' Motion to Dismiss Count I of Plaintiff's Complaint is **DENIED**, but the Court hereby **GRANTS** Defendants' Motion to dismiss Counts II and III.

## I.    BACKGROUND

### A.    Procedural Background

This is the second lawsuit Dr. Haliu Abatena ("Plaintiff") has filed against NSU and related Defendants. See Abatena v. Norfolk State Univ., et al., 2:13cv87 ("Abatena I"). Because the instant Motion asserts arguments related to Abatena I, the procedural history of both cases is recounted below.

### i.    *Abatena I*

Plaintiff filed his first suit against the named Defendants in the instant case on February 15, 2013, see 2:13cv87, and filed an Amended Complaint on April 11, 2013. In his Amended Complaint, Plaintiff alleged (1) age discrimination in violation of the Age Discrimination in Employment Act (29 U.S.C. § 621, et seq.) ("ADEA") and the Fair Labor Standards Act (29 U.S.C. § 601, et seq.) ("FLSA"); (2) hostile work environment and retaliation in violation of the ADEA and FLSA; and (3) breach of contract. On April 25, 2013, Defendants filed a Motion to Dismiss the ADEA and FLSA claims for lack of jurisdiction and for failure to state a claim upon which relief can be granted, and also requested dismissal of the breach of contract claim for lack of jurisdiction. On August 23, 2013, the Court found that Plaintiff's federal claims were barred by sovereign immunity and that Plaintiff had not met the jurisdiction prerequisites to raise a state claim. Accordingly, the Court dismissed Plaintiff's case without prejudice.

*ii. The instant action*

Abatena filed this action in the Circuit Court of the City of Norfolk, alleging: 1) that Defendants NSU and The Board of Visitors of NSU breached his contract of employment; 2) that the individual Defendants violated his due process rights under 42 U.S.C. § 1983; and 3) that NSU and the individual Defendants violated his Fourteenth Amendment right to procedural and substantive due process and retaliated against him for exercising his due process right.   On December 17, 2013, Defendants removed this case from Circuit Court, Doc. 1, and filed the instant Motion to Dismiss, Doc. 2.   On January 9, 2014, Plaintiff filed his Response in Opposition to the instant Motion, Doc. 5, and Defendants filed a reply on January 23, 2014.

On March 18, 2014, the Court held a hearing on Defendants' Motion to Dismiss, but withheld ruling until Plaintiff filed a more definite statement of facts.  Plaintiff made the required filing on March 28, 2014, Doc. 12, and Defendants filed a Reply on April 7, 2014, Doc. 13.

**B.**   **Factual Allegations[1]**

Dr. Hailu Abatena was a professor at Norfolk State University ("NSU") who was hired in August, 1997 to develop and direct the Community Development Concentration ("CDC") in the Ethelyn Strong School of Social Work ("School of Social Work") and teach courses in CDC as well as Research Methods. Doc. 1, Compl. ¶ 13. During his employment with NSU, Plaintiff taught graduate level Community Development and Research Methodology courses in the School of Social Work until NSU "eliminated" the CDC on or about 2007–2008. Compl. ¶ 18. Plaintiff continued to teach four (4) doctoral level classes as well as two (2) different sections of

---

[1] "In considering a motion to dismiss, [the Court] accept[s] as true all well–pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). The Court cautions, however, that the facts alleged by Plaintiff are recited here for the limited purpose of deciding the instant Motion to Dismiss. The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

master's level Research Methodology courses full time in the School of Social Work immediately after the CDC's closure; however, by 2010 enrollment in Plaintiff's classes had diminished, and he taught only two classes. Compl. ¶ 19. By Spring 2011, Plaintiff only taught one class at NSU. Id.

   *i. Plaintiff's grievances*

   In February 2006, Plaintiff filed a grievance with the NSU Faculty Senate Committee in accordance with NSU's Grievance Procedure, as outlined in the Faculty Handbook, alleging that NSU violated its policies and infringed upon his academic freedom by allowing three of Plaintiff's students who had received grades lower than a "B"—the minimal grade allowed under NSU's policy before a student would have to repeat the class—to advance in the graduate program and graduate. Compl. ¶¶ 30 – 31. In order to resolve the dispute, Abatena's 2006 grievance was mediated, and Plaintiff and NSU entered into an Agreement to Resolve Grievances ("the Agreement"), which was fully executed in writing by both parties in 2008. Compl. ¶ 33.

   As part of the Agreement, NSU assured Plaintiff that 1) the status and future of the CDC in the School of Social Work would be reexamined by appropriate University committees before the end of the 2007–2008 academic year; 2) that NSU would purge any derogatory reference to the facts which gave rise to the Agreement from Plaintiff's personnel files; 3) that NSU would adjust Plaintiff's salary during the University–wide salary study that was underway during 2007-2008; 4) the NSU's managers and officers would refrain from making any derogatory remarks about Plaintiff; and 5) that NSU would pay the cost of mediation. Compl. ¶¶ 34–38.

   After the Agreement, Plaintiff claims that NSU failed to meet any of these obligations and again changed one of his former student's grades to a passing score after he had assigned the

4

student a grade lower than a "B." Compl. ¶ 38. In June 2010 and in response, Plaintiff filed a complaint against Dr. Dorothy Browne, Dean of the School of Social Work, with the then−Provost alleging retaliation and harassment, and, *inter alia*, that Dean Browne was trying to remove him from teaching courses within his area of expertise and for which he was credentialed. Compl. ¶¶ 39−41. In his letter, Abatena outlined a dispute he was having with Dean Browne regarding the assignment of courses and acknowledged that while he did not have the experience to teach the courses he was assigned to teach, he believed that NSU was trying to force him to complete Clinical Social graduate work courses so that he would be able to teach a new curriculum. Compl. ¶ 44. Plaintiff claims the Provost never responded to his complaint. Compl. ¶ 45. By the end of 2010, Plaintiff was registered to teach one class in the Spring of 2011, less than a full course load, and a concern registered by the Dean in her communications with Plaintiff.

Following his June 2010 complaint against Dean Browne, Plaintiff maintains that NSU continued to take action against him in early 2011 by convincing students to enroll in other professors' courses after they had already enrolled in his; canceling his courses due to low enrollment; requiring him to "retool" in the area of social welfare policy before August 1, 2011, (so that he could teach courses he claims are outside of his field); attend training ten (10) hours per week, to be led by a junior faculty member, so as to learn how to advise students; and submit a complete manuscript of his most recent book for publication no later than the following summer. Compl. ¶¶ 46−47.

Believing that these actions imposed upon him new job requirements, Abatena filed an additional grievance on February 22, 2011 against the Dean Browne complaining that the Dean's January 2011 directives constituted further retaliation and harassment for his having exercised

his academic freedom and rights under the NSU Faculty Grievance Procedure. Compl. ¶¶ 51-52.

However, on February 14, 2011 the Faculty Senate Grievance Committee ("Grievance Committee ") had issued a memorandum to Vice Provost Clarence Coleman summarizing its review of and findings and recommendations relating to Plaintiff's December 28, 2010 grievance. Compl. ¶¶ 53-54. The Grievance Committee found that Dean Browne's actions towards Abatena appeared to be "capricious, ill-conceived and manipulative" and that NSU had manipulated Plaintiff's class enrollment so as to "starve" his class sections, making it appear that his enrollment was low, thereby providing an excuse to force Plaintiff to retool. Doc. 12, ¶ 1. The Grievance Committee recommended that Plaintiff be reinstated to his full-time status to teach the Research Methodology courses for which he was credentialed and be relieved of the ten hour per week "training for advising." Id. at ¶ 2, ¶ 4. Plaintiff claims that Provost Coleman violated the Faculty Handbook, § 8.7.4, by failing to respond to the Grievance Committee's findings, but instead terminating his employment. Id.

Also on February 14, 2011, Dean Browne notified Abatena that she was recommending his dismissal from NSU for failure to meet his contractual obligations. Specifically, the Dean noted that Abatena had failed to execute his contractual obligations; had been derelict in his duties as a tenured faculty member; had been insubordinate towards her by refusing to comply with her instructions and directive that he re-tool so that he could teach a different curriculum; and was in non-compliance with University policies which continued to negatively impact the School of Social Work. Doc. 3, Ex. G.

On April 7, 2011, Vice Provost Coleman notified Plaintiff by letter that it was his intention to dismiss Abatena, for cause, based on the violations noted by Dean Browne. Id.

6

Coleman noted that he had elected to wait until April 7th in the "hope that [Abatena] would take actions to remedy the violations and failures stated in Dr. Browne's letter," id., but that Abatena's continued violation of the terms of his employment contract left NSU with no choice but to dismiss him for cause. Id. Coleman provided Plaintiff five (5) days to provide a response to the allegations. Id.

On April 12, 2011, Plaintiff and his attorney met with the Vice Provost so that Plaintiff could respond to the allegations against him. During the meeting Abatena stated the following:

1. That he had complied with his supervisor's directive and had followed the University's contractual policy that he post office hours and provide advisement for students;

2. that he had not retooled as recommended by Dean Browne, but would take action in that regard within two weeks;

3. that he was only teaching one course during the Spring 2011 semester even though his contract and the Faculty Handbook required that Abatena teach nine hours each semester; and

4. that he had previously filed a grievance that had not been resolved to his satisfaction.

Doc. 3, Ex. G. Coleman explained that Abatena's grievance was not relevant to the concerns regarding his work duties and responsibilities, his non-compliance under his Contract and under the Faculty Handbook, and the directives given to him by Dean Browne in her February 14, 2011 letter. See Doc. 3, Ex. G at 1-2. Following the meeting, the Vice Provost gave Plaintiff time to retool, as directed by Dean Browne in February, so that he could teach other courses.

On June 14, 2011, Coleman notified Abatena via letter, citing §8.3.3 (I) and (7) of the Faculty Handbook, that he was dismissed from his position at NSU. Doc 3, Ex. G. The letter detailed NSU's efforts to work with Plaintiff and stated the numerous reasons for Plaintiff's

7

dismissal. Id. In the letter, Coleman stated that he had determined that Abatena's actions and behavior demonstrated the following: (1) a willful resistance to teach the prescribed nine credit hours course load during the Spring 2011 semester, which thereby resulted in his teaching only one course, (2) a failure by Abatena to advise students, (3) a failure by Abatena to have ten office hours a week, (4) a failure and lack of effort and initiative by Abatena to meet the directive that he retool, and (5) a refusal by Abatena to respond to and/or to comply with the directives of Dean Browne. Id. Coleman decided that Abatena's actions and behaviors were unacceptable and significantly affected the functioning of the School of Social Work and/or University. He concluded that NSU was left with no choice but to dismiss Abatena from his employment. Id.

On August 9, 2011, Abatena filed a formal grievance concerning his dismissal in accordance with the grievance procedure outlined in the Faculty Handbook, arguing that his termination violated the Faculty Handbook, NSU's own policies that governed the termination of fully-tenured faculty, and that the December 2010 and February 2011 grievances had not even made their way through the entire grievance process. Id. He further stated that these actions deprived him of his right to due process. Compl. ¶¶ 57 – 60. Pursuant to the University's grievance procedures, the Grievance Committee held a grievance hearing on October 7, 2011 and issued its findings and recommendations on October 17, 2011. Compl. ¶¶ 61–62; Doc. 3, Ex. H. However, instead of issuing its findings to the Office of the Provost, pursuant to NSU procedure, it provided its recommendations to the President of NSU, Mr. Atwater.[2] President Atwater refused to rule on the Grievance Committee's findings, instead forwarding the matter to Interim

---

[2] The Faculty Committee felt that having the office of the individual who had issued the dismissal also review the Faculty Committee's findings and recommendations regarding said dismissal constituted a conflict of interest.

Provost and Vice President for Academic Affairs Sandra DeLoatch over Plaintiff's written objections based upon the claimed conflict of interest. Compl. ¶¶ 63–64.

On November 15, 2011, DeLoatch sent Plaintiff and the Chair of the Grievance Committee a letter rejecting all of that Committee's findings and refusing to reinstate Plaintiff. Compl. ¶ 66. Plaintiff appealed DeLoatch's decision to President Atwater, which the President also rejected. On April 10, 2012, Plaintiff again appealed, this time to the Rector of the Board of Visitors; however, on June 22, 2012, that body also rejected Plaintiff's appeal, notifying him that his termination was effective as of June 19, 2012. Compl. ¶¶ 67–72.

*ii. The Employment Contract*

After being hired in 1997, Dr. Abatena was granted Tenure Faculty Appointment in 1999, with the terms of that position governed by a 2003 Appointment and a 2007 Faculty Handbook. Compl. ¶¶ 17, 76–77. The 2003 Appointment provides that "NSU appointments must be approved by the Board of Visitors and are subject to the prevailing regulations in the most recent edition of the Faculty Manual. Doc. 3, Ex. A, 2. At the time of Abatena's termination, the most recent edition of the Faculty Manual was the 2007 Teaching Faculty Handbook (the "Faculty Handbook"), which defines the standard for the dismissal of a tenured faculty member for cause, as well as the process that must be followed prior to dismissing a tenured faculty member. Compl. ¶ 26, ¶ 77. According to the Faculty Handbook, a tenured faculty member could only be terminated for cause. Plaintiff also contends that the Faculty Handbook incorporated by reference the American Association of University Professors' (AAUP) policies, which add additional requirements and procedures universities must follow before discharging a tenured professor, (like establishing "clear and convincing evidence" that cause exists to terminate). Collectively, the 2003 Appointment and the Faculty Handbook constitutes the parties' agreement

9

concerning Plaintiffs' tenure appointment, and are considered the "Employment Contract" (or "Contract") for the purposes of this Motion.[3]

## II.   LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff") (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). Although a court must accept as true all well−pleaded factual allegations, the same is not true for legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding the motion, a court may consider the facts alleged on the face of the complaint, as well as "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (1990)). The court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for

---

[3] The parties disagree over whether the AAUP policies are a part of the Contract at issue.

summary judgment.   See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted).

### III.   ANALYSIS

Defendants seek to dismiss the instant case by arguing that each of Plaintiff's three claims fails the Iqbal/Twombly plausibility standard of pleading.

### A.   Breach of Contract

In Virginia, the elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A., 251 Va. 28, 466 S.E.2d 382, 386 (1996).

"[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, [f]actual allegations must be enough to raise a right to relief above the speculative level." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) aff'd sub nom. Coleman v. Court of Appeals of Maryland, 132 S. Ct. 1327 (U.S. 2012) (citations omitted).   Courts frequently use the evidentiary frameworks set forth above to inform their evaluation of a plaintiff's allegations at the motion to dismiss stage. Hart v. Lew, No. 12–03482 ELH, 2013 WL 5330581 *16 (D. Md. Sept. 23, 2013); Coleman, 626 F.3d at 190; McDougall v. Maryland Transit Admin., No. 11–3410 WDQ, 2012 WL1554924 *3 (D. Md. Apr. 27, 2012).

Here, Plaintiff claims that Defendants took several actions that violated his rights under his tenure Appointment, the Faculty Handbook, and the AAUP. Unsurprisingly, Defendants assert that Plaintiff fails to state a viable cause of action for breach of contract.   Instead,

Defendants argue that the facts demonstrate that, to the extent the Contract was breached, it was Abatena who breached it.

    i.    *The Contract's Requirements that Faculty Follow the Directions from the Head of Their Department*

First and in support of their argument, Defendants argue that Plaintiff has failed to identify what provisions of the Employment Contract Defendant NSU breached, and that he himself breached the Contract by failing to heed Dean Browne's directives and perform the duties he was contractually bound to perform. Specifically, Defendants point to the fact that Plaintiff acknowledges that NSU eliminated the Community Development Concentration in 2007–08, that he was asked to teach classes in the Clinical Social Work curriculum, and that he refused to retool or learn new skills so that he could teach a new curriculum.

Defendants further assert that Plaintiff's Contract required him to follow the directives of the head of his department. The first sentence of the 2013 Appointment states that the "[d]uties and responsibilities of the teaching faculty will be defined by the head of the respective department and approved by the respective dean and the Vice President for Academic Affairs." Doc. 3, Ex. A. Thus, Defendants conclude that Abatena's refusal to retool and equip himself with the necessary knowledge to teach another curriculum after his own program was discontinued constitutes Plaintiff's breach of contract, not NSU's.

While Defendants' argument that Plaintiff breached his own employment contract may have merit, a motion to dismiss is not the appropriate vehicle to raise it. As such, the Court need not address it in ruling on the instant Motion.

12

*ii.    Academic Freedom*

In his Complaint, Plaintiff alleges that as a tenured professor and as the 2006 Agreement states, he possessed the right to Academic Freedom, which NSU breach by changing three of his former students' grades to enable them to advance in the program. Compl. ¶¶ 30–28. Defendants move to dismiss Plaintiff's claim for breach of contract based upon these grounds by arguing that any violation is barred by the applicable statute of limitations, as the changes in the students' grades occurred more than four years before the filing of the instant lawsuit.

However, Defendants ignore Plaintiff's allegation that the University once again changed another student's grade following the 2008 Agreement that resulted from the 2006 grievance mediation concerning the three initial grade changes. Compl. ¶ 40. Assuming the truth of Plaintiff's allegation, then any such action by the University would have occurred after 2008 and the execution of the Agreement. As Defendants have failed to provide this Court with any more support for their statute of limitations defense, Plaintiff's claim for breach of contract on these grounds survives the instant Motion.[4]

*iii.    Breach of the 2007 Faculty Handbook*

Plaintiff complains that Defendants breached the Faculty Handbook, part of his Employment Contract, in a number of ways. First, Plaintiff believes that NSU failed to comply with the Post Tenure Review Process outlined at §3.8 of the 2007 Teaching Faculty Handbook when they dismissed him because they did not provide him with a post–tenure review. Compl. ¶ 79. However, in Defendants' view, Section 3.8 of the Handbook is inapplicable to the situation

---

[4] Defendants also argue that "Plaintiff's complaints about academic freedom are of no import" because 1) those complaints do not override his contractual obligation to teach; and because 2) Plaintiff misapprehends the nature of academic freedom, which does not include the right to be the final arbiter of students' grades. Doc. 3 at 13. However, as Defendants have failed to make an argument that Plaintiff's ground for breach of contract is not a cognizable legal claim, the Court need not address it.

at bar because it deals with situations where a tenured professor has failed to meet minimal obligations and standards for an annual peer evaluation for any year. Defendants maintain that Plaintiff did not fail to meet any minimal obligation and standards but simply refused to meet the standards out of insolence. They claim that "[P]laintiff was not dismissed because he was unable to teach; he was dismissed because he was unwilling to teach," and as such, the post-tenure review provision is inapplicable to Plaintiff.

Upon review of the Plaintiff's Complaint and the relevant parts of the Faculty Handbook, this Court finds that Plaintiff has alleged sufficient facts to support his breach of contract claim against NSU on the stated grounds. Assuming the truth of Plaintiff's allegation that he was unable to meet the minimal requirements, then it is clear that he should have been provided with the post–tenure review. As the Plaintiff points out, communication between himself and the University is full of language concerning his inability to teach more classes without retooling and his failure to "meet minimum teaching requirements." As such, Plaintiff has alleged a plausible claim for breach of contract.

Second, Plaintiff claims Defendants breached the Contract because Vice Provost Coleman did not respond to the Grievance Committee's February 14, 2011 report, as he was required to under the Faculty Handbook. See Compl. ¶ 81; Doc. 5 at 7. Defendants counter by arguing that these factual allegations cannot support a breach of contract claim because the February 14, 2011 report was labeled "informal," see Doc. 3, Ex. H at 2, and thus under the Faculty Handbook § 8.7.1, the Committee's report did not require a response from NSU's administration. However, in Plaintiff's Response, Doc. 5, he clarifies his allegation by stating that the February 14, 2011 report was in response to his formal December 28, 2010 grievance, which according to the Faculty Handbook Section 8.7.2, requires an affirmative response from

14

the University. Doc. 5 at 7−8. Thus, viewing these facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff has properly alleged a breach of contract claim on the grounds described above.

Thirdly, Plaintiff makes a series of complaints that NSU breached the Contract in how they handled his termination. Abatena asserts that the University breached the Contract by terminating him "without consideration of his pending grievance," which he claims is a violation of the AAUP's Recommended Institutional Regulations on Academic Freedom and Tenure, Number 5, and various other NSU policies, because NSU did not provide clear and convincing evidence to support the cause for termination. Compl. ¶¶ 81−82. Defendants, however, argue that Plaintiff fails to identify any specific part of the Contract that this action violated, as Defendants maintain that the AAUP standards are not part of Plaintiff's Employment Contract.

Interpretation of a contract, including its component parts, is a question of law and not fact; thus, it is inappropriate at the motion to dismiss stage for this Court to interpret the parties' contract and evaluate the viability of Plaintiff's claims based on the terms of the contract. See Cruz v. Beto, 405 U.S. 319, 322 (1972). While the Court need not assume the truth of Plaintiff's allegations that are mere legal conclusions, see Twombly, 550 U.S. 544, 570 (2007), Plaintiff has provided facts that make it plausible that the University adopted the AAUP standards, and that the University's handling of Plaintiff's termination failed to meet those standards. The Faculty Handbook itself, which Defendants concede is part of Plaintiff's Employment Contract, states that NSU endorses the "Statement of Principles of Academic Freedom and Tenure, not only by virtue of its membership in the American Association of Colleges, . . . but also [because] the University feels strongly that . . . rights of due process for the faculty . . . are essential to the pursuit of academic excellence at this institution." Doc. 3, Ex. B at 43. As such,

15

the Court finds that it is plausible that Plaintiff's grievance was formal and required a written response from Defendants; thus, Plaintiff has made out a viable claim on these grounds is plausible.

Plaintiff further claims that NSU breached the Contract when it allowed Interim Provost and Vice President for Academic Affairs Sandra DeLoatch to rule on his grievances, as he and the Grievance Committee believed the referral to her office caused a conflict of interest due to the fact that her office initially issued the dismissal. Compl. ¶ 83. However, this allegation fails to support a breach of contract claim as the University followed its own procedure, pursuant to §8.7.2.4 of the Faculty Handbook, which requires the Vice President for Academic Affairs to rule upon employee grievances. See Doc. 3, Ex. B § 8.7.2.4.[5] Therefore, this ground for breach of contract fails to survive the instant Motion.

Relatedly, Plaintiff asserts a breach of contract claim based upon Defendant DeLoatch's outright rejection of the Grievance Committee's findings and recommendation to reinstate him. In Plaintiff's view, he filed a formal grievance, (as opposed to an informal complaint), and as such was entitled to have DeLoatch either "affirm, modify, or refer the case back to the Hearing [Grievance] Committee for further deliberation," under Section 8.7.2(4) of the Faculty Handbook. While Defendants dispute Plaintiff's claim, and rebuts by asserting that Plaintiff's complaint was informal and thus allowed DeLoatch to simply reject the Grievance Committee's findings, this Court must "accept as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff."

---

[5] President Atwater ultimately conducted his own review of Plaintiff's grievance, and also rejected the Plaintiff's appeal of his dismissal. See Compl. ¶ 68; Ex. J.

Mylan Labs., 7 F.3d at 1134.  As such, Plaintiff's breach of contract claim on these grounds is viable.

Next, Plaintiff complains that University President Atwater breached the Contract when he did the following: 1) rejected the Grievance Committee's recommendations without putting his reasons in writing, 2) failed to provide the Grievance Committee an opportunity to respond to his rejection of their recommendations, and 3) failed to ensure that DeLoatch complied with NSU's administrative requirements in her review of Plaintiff's complaints. Compl. ¶¶ 84−85; Doc. 5 at 8.  Defendants rebut by arguing that according to the Faculty Handbook Section 8.7.2.3, the Grievance Committee 's findings have no binding effect upon the President.  Again assuming that Plaintiff's allegation that he filed a formal grievance with the University is true, NSU was bound by the formal grievance process, and under Faculty Handbook Section 2.1.2, President Atwater had a duty to ensure that his subordinate, DeLoatch, complied with administrative procedure and to follow it himself.  Accordingly, the Court finds there is an actionable breach of contract claim on these grounds.

In in paragraphs 85, 86, and 87 of the Complaint, Abatena asserts generally that that NSU: 1) "breached the employment contract" by denying his appeal of his termination 2) "retaliate[d]" against him after he filed grievances through NSU's procedures, and 3) "fail[ed] to follow their own policies." The University defends by arguing that these claims are insufficient because they are merely conclusory allegations, and the Court agrees.  Furthermore, these assertions are merely duplicative of other allegations stated more fully in other parts of the Complaint; consequently, they are dismissed.

*iv.*    *Standards for interpreting the Faculty Handbook*

Finally, in the instant Motion, Defendants argue that Plaintiff is incorrect in his assertion that NSU bears the burden of proof to show for cause termination by clear and convincing evidence. Plaintiff once again relies upon Faculty Handbook Section 8.3.3 and AAUP standards, No. 5(c)(8) in support of his argument that Defendants breached the Contact by failing to abide by these standards. Whether Defendants have the burden of proof to establish cause for Plaintiff's termination by clear and convincing evidence is again a question that would call upon this Court to determine if the AAUP's standards are incorporated into the Contract at bar. As previously, discussed, contract interpretation is a matter of legal construction, not of fact. On its face, Plaintiff's Complaint provides enough facts to support his allegations that the University violated its policies by failing to produce clear and convincing evidence to terminate him for cause; therefore, Plaintiff has made out a viable breach of contract claim.

*v.*    *Summary*

Based upon the foregoing reasons, the Court finds that Plaintiff's breach of contract claim survives the instant motion on certain grounds, including the allegations that Defendants violated his Academic Freedom and that they violated the 2007 Faculty Handbook as described in depth, above.

**B.    Plaintiff's Section 42 U.S.C. § 1983 Claim for a Due Process Violation**

In his Complaint, Plaintiff alleges that Defendants, generally, violated his constitutional due process rights under Section 1983. Compl. ¶¶ 91–102. Section 1983 is a federal statute that provides a remedy for violations of civil rights by state actors acting under color of law. See, e.g., Monroe v. Pape, 365 U.S. 167, 172 (1961). It does not, by itself, confer any substantive rights. Graham v. Connor, 490 U.S. 386, 393–94 (1989).

18

Section 1983 allows lawsuits against

> [e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983 (emphasis added). The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under Section 1983." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).   Under Virginia Law, Defendant Norfolk State University is a state government entity. Va. Code § 23–50.5. Accordingly, since Section 1983 is the remedy for constitutional violations by state actors and a state is not a person under Section 1983, NSU cannot be sued under the same. Thus, for the sake of clarity, the Court dismisses Abatena's claims against NSU for alleged constitutional violations.[6]

In order to establish a procedural due process claim in a Section 1983 action, plaintiffs must establish three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest. Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 826 (4th Cir. 1995). "[I]n order for an individual to be liable under Section 1983, it must be affirmatively shown that the official charged acted

---

[6] The Court also notes that neither Congress, Virginia, nor NSU have waived sovereign immunity for the claims raised in the instant case. See, e.g., Hunter v. Va. State Bar, 786 F. Supp. 2d 1107, 1111 (E.D. Va. 2011) (holding that Congress has not abrogated sovereign immunity for § 1983 cases); Haley v. Va. Dep't of Health, No. 4:12–CV–00016, 2012 WL 5494308, at *5 (W.D. Va. Nov. 13, 2012) ("[I]t is well settled that the [Virginia Torts Claim Act] does not waive Virginia's Eleventh Amendment immunity. . . . Moreover, the Supreme Court of Virginia has reaffirmed that [the Virginia Torts Claim Act]'s limited waiver does not extend to state agencies."); Nofsinger v. Va. Commonwealth Univ., No. 3:12–CV–236, 2012 WL 2878608, at *12 (E.D. Va. July 13, 2012) (holding that the Eleventh Amendment barred breach of contract claims against Virginia Commonwealth University) aff'd, No. 12–1961, 2013 WL 1305672 (4th Cir.  Apr. 2, 2013).

personally in the deprivation of the plaintiff's rights." Garraghty v. Virginia, Dep't of Corrections, 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting Wrightv. Collins, 766 F.2d 841,850 (4th Cir. 1985)) (internal citations omitted); Vinnedge v. Gibbs, 550 F.2d 926,928 (4th Cir. 1977).   Liability cannot attach if a defendant merely fails to act to prevent a constitutional deprivation. Rizzo v. Goode, 423 U.S. 362, 377 (1976).  An active role is essential. Id.

In Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985), the Supreme Court outlined the due process protections that are to be afforded to tenured employees. Specifically, the Court explained that a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Loudermill, 470 U.S. at 546.  The Court further explained that the purpose of pre–termination process is to provide "an initial check against mistaken decisions" but that it "need not be elaborate" or "definitively resolve the propriety of the discharge." Id. at 545. The Court went on to conclude that its "holding rest[ed] in part on the provision in Ohio for a full–post termination hearing." Id. at 546.  Thus, a qualifying employee is due both notice and an opportunity to respond to the notice prior to termination, as well as any post–administrative procedures he is entitled to under applicable policies or statutes.  See Holland v. Rimmer, 25 F. 3d 1251, 1259 (4th Cir. 1994).

In the case at bar, Defendants do not dispute that as a tenured professor, Plaintiff had a continuing property interest in his employment or a liberty interest in his professional good name and reputation, nor do they contend that his termination deprived him of a property interest. Rather, Defendants maintain that 1) Plaintiff's 1983 claim is time-barred, and 2) Plaintiff has not stated a claim for a violation of his procedural due process right because he was given notice of his termination, an opportunity to respond, as well as a post-termination appellate process, which

he utilized. However, in Plaintiff's view, Defendants failed to provide the due process he was entitled to because they failed to follow their own procedures and standards, namely, those outlined in the Post Tenure Review Process Section 3.8 et seq.; the Faculty Evaluation Process, Section 6.1 et seq.; the Dismissal for Cause sections of the Faculty Handbook; and AAUP policies. Compl. ¶ 93.

Specifically, Plaintiff lists three main grounds for his 1983 procedural due process claim: 1) that President Atwater's referral of the Grievance Committee 's October 17, 2011 letter to DeLoatch, an individual with an alleged conflict of interest, for review prevented him from receiving a hearing by an impartial tribunal prior to his dismissal; 2) that Coleman terminated him prior to the resolution of his grievance complaint and without any consideration of the Grievance Committee's February 14, 2011 memorandum; and 3) that DeLoatch reviewed and ultimately rejected the Grievance Committee 's findings and recommendations without following the Faculty Handbook's requirement that she transmit her objections and their underlying reasons back to the Grievance Committee for further consideration. Compl. ¶¶ 98–102. The Court will first address Defendants' statute of limitations argument and then discuss the argument for failure to state a 1983 claim.

Section 1983 does not have its own statute of limitations. Consequently, the state statute of limitations for personal injury actions, as the most analogous state cause of action, would typically define the time limit for bringing suit. Almond v. Kent, 459 F.2d 200, 203–04 (4th Cir. 1972); Lucas v. Henrico Cnty. Sch. Bd., 822 F. Supp. 2d 589, 605–06 (E.D. Va. 2011); Amr v. Va. State Univ., No. 3:10cv787, 2011 WL 4404030 at *14 (E.D. Va. Aug. 11, 2011). Virginia applies a two–year statute of limitations to personal injury claims. Va. Code Ann. § 8.01–243

("[E]very action for personal injuries, whatever the theory of recovery . . . shall be brought within two years after the cause of action accrues.").

Defendants seek to dismiss Plaintiff's Section 1983 due process claim by arguing that it is time barred. Defendants maintain that Plaintiff cannot rely on alleged acts of discrimination or retaliation that occurred more than two years (2) from the filing of the instant action. See Wilson v. Garcia, 471 U.S. 261, 266-69 (1985); Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). They conclude that at the latest the statute of limitations began to run the date Plaintiff was terminated, June 14, 2011.

Contrary to Defendants' position, this Court finds that Defendants' calculation of the accrual date for Plaintiff's 1983 claim is improper due to the fact that the University continued to hold hearing on the subject of Plaintiff's termination and the grievances at bar. It is of no moment that the individual Defendants were not directly involved with the proceedings subsequent to Plaintiff's termination; what is of import is that their decisions continued to be review by other bodies within the University as part of an appellate process. As such, Defendants' statute of limitation defense fails.

Next, in considering the first of Plaintiff's due process allegations that Defendants violated his rights by failing to afford him with an impartial pretermination hearing, the Court notes that the Fourteenth Amendment does not require that an employee necessarily receive the full panoply of due process rights at a pretermination hearing where the available post - termination procedures protect those rights. See Loudermill, 470 U.S. at 545. The right to an impartial decision-maker is one right that may be dispensed with at a pretermination hearing, "so long as due process is provided in a post-termination hearing." Walker v. City of Berkeley, 951 F.2d 182, 184 (9th Cir. 1991).

22

Here, Plaintiff does not contend that he was denied a meaningful and impartial post-termination process, or that the Board of Visitors, who ultimately reviewed his termination, was biased by the University's pre–termination actions. Furthermore, it would be nonsensical for this Court to rule that Plaintiff has made out a legal claim for a procedural due process violation because Defendants *followed* their own procedures in referring Plaintiff's claims to DeLoatch. Indeed, to allow the claim to continue on these grounds would be the equivalent of saying that Defendants were in a no win situation—they could have violated their own procedures by failing to refer Plaintiff's grievance to DeLoatch, or they could have done exactly as they did and refer the matter to her, despite the fact that her office potentially had a conflict of interest in reviewing Plaintiff's complaint.  Accordingly, the portion of Plaintiff's due process claim that rests upon the alleged conflict of interest grounds is dismissed.

Plaintiff's second and third due process allegations are relatively straightforward. Plaintiff maintains that according to the Faculty Handbook, § 8.7.2.4, Coleman was required to respond to the Grievance Committee's findings. Compl. ¶ 99.  Instead of following this procedure, Plaintiff claims that Coleman gave no response, but instead issued the June 14, 2011 letter notifying Plaintiff of his dismissal effective immediately. Id.  Furthermore, Plaintiff claims that DeLoatch's actions in outright rejecting the Grievance Committee's findings and recommendations rather than affirming, modifying, or referring the case back to the Grievance Committee for further deliberation deprived him of his "continued employment and his liberty interest in his good name and professional reputation." Compl. ¶¶ 100–102.

Far from disclosing a violation of his constitutional rights, Plaintiff's Complaint, viewed in his favor, reveals that NSU provided procedural safeguards beyond the requirements of the Fourteenth Amendment.  For example, in a letter dated February 14, 2011, Dean Browne notified

23

Plaintiff of his non -compliance with University requirements and restated Abatena's contractual job requirements. Then, on April 7, 2011, Vice Provost Coleman notified Abatena by letter that it was his intention to dismiss Abatena for cause based on the violations noted by Dean Browne. Doc. 3, Ex. G. Coleman specifically noted that he had elected to wait until April 7th in the "hope that [Abatena] would take actions to remedy the violations and failures stated in Dr. Browne's letter." Id. It is of note that Plaintiff was not officially dismissed for another two months.

Coleman also held a meeting with Abatena and his attorney on April 12, 2011, allowing Plaintiff to explain why Coleman should not take the intended action of dismissing Abatena based on the reasons stated in the April 7, 2011 letter. Further, no immediate action was taken against Abatena in order to allow him additional time in which to comply and/or retool. Id. Specifically, Abatena was given notice that in the University's view, his failure to advise students, have ten office hours a week, learn new material so that he could teach different classes, and actually teach those classes constituted cause for termination. These steps taken by the University prior to his termination ensured that Abatena received adequate notice of the University's intent to dismiss him, and that he was given opportunities to respond. Lastly, when Abatena was dismissed, his termination letter stated the reasons for his dismissal, which matched the reasons Coleman gave to Abatena, pretermination, when explaining why he was recommending dismissal. Though the University may have imprudently terminated Abatena while his initial grievances were still pending, such processes exceeded those mandated by the United States Constitution. As such, minor deviations from those procedures would not support a claim under the Fourteenth Amendment and Section 1983. See Phat Van Le v. Univ. of Med. & Dentistry of N.J., 379 F. App'x 171, 175 (3d Cir. 2010); accord, Winnick v. Manning, 460 F.2d 545, 550 (2d Cir.1972) ("[W]e are not inclined to hold that every deviation from a

24

university's regulations constitutes a deprivation of due process."); Cobb v. Rector, Visitors of the University of Virginia, 69 F. Supp. 2d 815, 828–29 (W.D. Va. 1999). Indeed, Plaintiff was afforded a full post-termination hearing, which ensured that he was given adequate process; as such, Plaintiff's allegations do not amount to a constitutional violation.

Even if Plaintiff had alleged sufficient facts to support his allegations that the individual Defendants violated his due process rights, the individual Defendants raise the defense of qualified immunity, and the Court agrees that its principles are applicable in the instant action. Qualified immunity protects a government official from liability in Section 1983 actions arising from the performance of discretionary actions. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity applies so long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id.

The analysis of a qualified immunity claim entails two steps. First, the court must decide "whether a constitutional right would have been violated on the facts alleged." Saucier v. Katz, 533 U.S. 194, 200 (2001); Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003). Then, the court must determine whether, at the time of the violation, a reasonable person in the defendant's position would know that his actions would violate a clearly established right. Simmons v. Poe, 47 F.3d 1370, 1385 (4th Cir. 1995). A court, however, has flexibility in the order in which it must perform this analysis. Abbas v. Woleben, 3:13CV147, 2013 WL 5295672 (E.D. Va. Sept. 19, 2013).

While this Court has already determined that Plaintiff has not alleged a violation of his constitutional rights, it also finds that the individual defendants are entitled to qualified immunity. As previously discussed, President Atwater was following University policy by referring Plaintiff's grievance complaint to Deloatch's office for review; thus, even assuming for

25

the sake of argument that his action did constitute a violation of Plaintiff's rights, it is inconceivable that he did so in knowing violation of those rights. Indeed, it is common sense to say that no official following his own University procedure would believe that his actions constituted a violation of another's constitutional rights. This is especially true when considering that the same official was responsible for handling grievance appeals. As the Fourth Circuit has said "[o]fficals are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

While DeLoatch's "outright rejection" of the Grievance Committee's findings and recommendations, Compl. ¶ 101, may have been improper, the facts do not support the finding that she knew or should have known her actions were in violation of Plaintiff's due process rights. Plaintiff's claim again DeLoatch centers upon her failure to affirm, modify, or refer his grievance back to the Grievance Committee; however, the Faculty Handbook does not limit the extent to which the Vice President of Academic Affairs may "modify" the recommendations of the Grievance committee. See Doc. 3, Ex. B, § 8.7.2(4). Additionally, in all cases, the Vice President of Academic Affairs is charged with making the final, (non – appellate) decision concerning dismissals, id. at § 8.7.2(3), and notably, under Section 8.7.2(6), the Vice President of Academic Affairs' authority is plenary. Again, Plaintiff has failed to supply this Court with any facts that would support the finding that a reasonable person in DeLoatch's position would know that her actions were violative of his rights. Accordingly, DeLoatch, along with President Atwater, is protected by qualified immunity.

Lastly, Plaintiff claims that Vice Provost Coleman should not have terminated him "prior to the resolution of his ongoing grievances and without consideration for the Grievance Committee's February 14, 2011 memorandum." Compl. ¶ 99. However, like Plaintiff's

26

allegations against Atwater and DeLoatch, Plaintiff has failed to allege any facts that demonstrate that a reasonable person in the Vice Provost's position would have cause to believe his actions would violate Plaintiff's constitutional or statutory due process rights. As Defendants point out, the Faculty Handbook does not indicate that a grievance must be resolved prior to an employee's dismissal. Doc. 13 at 4. Furthermore, even assuming that Plaintiff's grievance could be designated "formal," (though the Grievance Committee's February 14, 2011 findings referred to the hearing as "informal," to which no response would be required from Coleman), Doc. 3, Ex. H at 2, Coleman provided a detailed explanation and in depth reasons for his dismissal of Abatena. Accordingly, Coleman is also entitled to immunity from Plaintiff's Section 1983 claim.

In summary and for the reasons discussed above, Plaintiff's due process claim against the University is dismissed with prejudice.

## C.    Retaliation Claims Against Individual Defendants

To state a claim for retaliation under section 1983, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Conclusory assertions of retaliation are insufficient to establish a retaliation claim. Id. at 74.

In his third claim, Plaintiff alleges that Defendants retaliated against him as the result of his filing a 2006 grievance. Compl. ¶ 105. Specifically, Plaintiff believes that Defendants improperly eliminated the CDC without justification as part of their retaliation against him; that Defendants instigated an intentional campaign to make it appear that enrollment in Plaintiff's courses was low; and that Defendants spoke poorly of him, damaging his professional reputation and good name. Id.

27

Plaintiff's retaliation claim must fail as a matter of law as it is unsupported by facts that render it plausible. For example, while Plaintiff alleges that NSU manipulated his course enrollment, Compl. ¶¶ 46–47, he neglects to provide facts that would allow this Court to infer a causal connection between the 2006 grievance and the alleged retaliatory acts. Indeed, there are no allegations in the Complaint that Defendants Deloatch and Atwater were even aware of Plaintiff's previous complaints against the University. While Plaintiff pleads a number of facts concerning actions taken against him, Compl. ¶¶ 39 –68, they fail to show any type of retaliation by the named Defendants. Plaintiff states that it was "NSU's violation," and that it was "Dean Browne, in concert with others" who "began trying to move Plaintiff from his usual courses." Comp. ¶ 38, ¶ 41. Plaintiff's use of the passive voice describing how his "class enrollment was manipulated to make it appear he had low enrollment" again demonstrates a lack of connection between the complained of actions by University administrators and the Defendants Atwater, Coleman, and DeLoatch. Compl. ¶¶ 46 – 47. Furthermore, Plaintiff's Complaint fails to overcome Atwater, DeLoatch, or Coleman's qualified immunity, because it does not articulate the Defendants respective participation in the alleged constitutional violations. Accordingly, Plaintiff's retaliation claim is dismissed with prejudice.

## D. Supplemental Jurisdiction Over Plaintiff's State Law Claim

Despite dismissing both of Plaintiff's federal claims, Count II and Count III, the Court finds it appropriate to continue to exercise jurisdiction over Plaintiff's state law breach of contract claim, Count I, after its initial exercise of supplemental jurisdiction.

Federal courts may exercise supplemental jurisdiction over state law claims if they "form part of the same case or controversy" as claims that are properly within the jurisdiction of the federal court. 28 U.S.C.A. § 1367 (West 1993). "The state and federal claims must derive from a

28

common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 725 (1966); <u>see also</u> <u>Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.</u>, 145 F.3d 660, 662 (4th Cir. 1998) (noting that § 1367 codified the Supreme Court's holding in <u>Gibbs</u>).

Here, there can be no argument that Defendants properly removed Plaintiff's case from Circuit Court for the City of Norfolk, as Plaintiff clearly alleged federal statutory and Constitutional violations on the face of his Complaint. Likewise, it is apparent that Plaintiff's breach of contract claim arises out of the "same core of operative facts" as his procedural due process and retaliation claims. Indeed, in pleading his state law contract Plaintiff specifically incorporated by reference the factual allegations supporting his federal claims. All of the allegations in the Complaint concern Defendants' handling of Plaintiffs' termination and his subsequent grievances. Therefore, Section 1367 permits the Court discretion whether to exercise federal jurisdiction over the state claims.

Once a district court's discretion is triggered under Section 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988). "The doctrine of supplemental jurisdiction is one of flexibility, and there is no 'mandatory rule' requiring dismissal when the federal claim is disposed of before trial." <u>Id.</u> at 350 n. 7. Likewise, the Fourth Circuit has noted that district courts enjoy "wide latitude" when deciding whether to exercise supplemental jurisdiction in an action. <u>Shanaghan v. Cahill</u>, 58 F.3d 106, 110 (4th Cir. 1995).

29

Here, the Court finds that it is in the interest of judicial economy and fairness to retain jurisdiction over Plaintiff's breach of contract claim. First, this Court has already expended a considerable amount of judicial resources in ruling upon the parties' motions. As noted in the procedural history, this Court previously adjudicated one action between Plaintiff and Defendants in Abatena I, when it granted Defendants' Motion to Dismiss without prejudice. In the present action, the Court has issued an order extending the time for Plaintiff to respond to Defendant's Motion to Dismiss, Doc. 7; held a Rule 26(f) Conference; issued a Rule 16(b) Scheduling Order; reviewed supporting memoranda and the hundreds of pages of appended documents before holding a hearing on the instant Motion; and then decided the instant Motion after re-examining Plaintiff's Complaint in light of his More Definite Statement and Defendants' Reply.

Given this Court's familiarity with Plaintiff's claims, the fact that Plaintiff's breach of contract claim involves neither an unsettled nor a complex area of state law, and that this Court has already expended a significant amount of time and resources on Plaintiff's actions, it is consistent with the principles of judicial economy, convenience, and fairness for this Court to retain jurisdiction over Count I of Plaintiff's Complaint.

## IV. CONCLUSION

For the reasons set forth above and on the record, Defendants' Motion to Dismiss with prejudice is **GRANTED** as to Count II and Count III of Plaintiff's Complaint, Doc. 1. Defendant's Motion to Dismiss as to Count I is **DENIED**, with the exception of the non-viable breach of contract grounds as explained herein.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/

_____
Henry Coke Morgan, Jr.
Senior United States District Judge

_____
*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 6, 2014

31